IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
CONVERGIA NETWORKS, INC. and
FUTURE ELECTRONICS INC.,

        Plaintiffs,

    -- against --

HUAWEI TECHNOLOGIES CO., LTD. and
FUTUREWEI TECHNOLOGIES, INC.,

        Defendants.
-------------------------------------------------------x

JUDGE CASTEL

06 CV 6191

06 CIV _____

**COMPLAINT**

Plaintiff Convergia Networks, Inc. and Future Electronics, Inc. (collectively, "Convergia"), by its attorneys Mayer, Brown, Rowe & Maw LLP, for its complaint against Defendants Huawei Technologies Co., Ltd. and Futurewei Technologies, Inc. (collectively, "Huawei"), alleges as follows:

**NATURE OF THE ACTION**

1. This action seeks an order compelling arbitration, to be conducted in accordance with Sections 5.2.4.4 and 8.22 of the NGN Data Network Purchase Agreement (the "NDN Data Agreement" or the "Agreement"), effective September 7, 2004 between Convergia and Huawei. Further, and among other things, Convergia alleges claims against Huawei under the common law of New York for breach of contract and fraudulent inducement concerning the Agreement. Convergia also seeks provisional relief in aide of arbitration in the form of an injunction prohibiting Huawei from terminating the Agreement pending the resolution of the arbitration proceedings.

1

2. The relief sought in this action is necessary because of Huawei's frivolous and preemptory termination of the Agreement by way of a letter from Mr. Yun Ding, President of Huawei's Wire-Line Product Line, dated July 25, 2006 (the "Termination Letter"). As will be discussed below, the Termination Letter violates Section 5.2.4.4 and Section 8.22 of the Agreement and is therefore invalid.

3. If the injunctive relief sought here is not granted, Convergia will suffer immediate and irreparable harm. For example, many of Convergia's telecommunications licenses, amounting to approximately fifty (50) specific licenses, including but not limited to, local telephony licenses, national long distance licenses, international long distance licenses and value added licenses encompassing data, multi-media and video amongst other services, will either be revoked by local governments and regulatory agencies and/or will expire, thereby depriving Convergia of the ability to ever offer telecommunications services in all of the countries governed by the Agreement. In addition, Convergia's customers will be left without essential telecommunication services and thus, Convergia will irretrievably lose its residential, wholesale and business telecommunications customers, to its competitors. Furthermore, Convergia's business reputation will be so severely impacted from a negative standpoint as to put the company in bankruptcy. As outlined herein, Convergia's entire operation is dependant upon Huawei's network to the extent that if the termination is to stand, Convergia will be forced to cease almost all operations, resulting not only in the closure of the company and the filing of bankruptcy, but in addition, all of Convergia's approximately five hundred employees will lose their employment. Convergia would, in all likelihood, also face a litany of lawsuits that would be likely be filed against Convergia by its own customers,

suppliers, government and regulatory agencies in all of Convergia's countries of operation, among others.

## JURISDICTION AND VENUE

4. This Court has jurisdiction pursuant 28 U.S.C. § 1331, 9 U.S.C. § 201, 9 U.S.C. § 203, 9 U.S.C. § 206, and pursuant to the Court's supplemental jurisdiction.

5. Venue is proper in this judicial district pursuant to 9 U.S.C. § 204, in that the Agreement at issue, which includes the relevant arbitration clauses and a provision mandating that all proceedings take place in New York, New York, fall under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "Convention").

## THE PARTIES

6. Plaintiff Convergia is a Canadian corporation, having its principal place of business at 237 Hymus Blvd., Pointe-Claire, Quebec, Canada H9R 5C7. Convergia, with operations beginning in 1998, is a provider of voice, data, value added, and Internet services for residential, business and wholesale customers and is a significant player in the global telecommunications market. Based in Canada, its global network spans over 152 points of presence in 45 countries throughout the globe. Convergia owns local telephony licenses, national long distance licenses, international long distance licenses and value added licenses encompassing data, multi-media and video amongst other services in seventeen (17) countries throughout North, Central and South America as well as Spain and Portugal and has retail operations in over eleven (11) countries.

7. Defendant Huawei is a Chinese corporation, having its principal place of business in Shenzhen, People's Republic of China. Huawei is a multi-billion dollar global vendor and provider of telecommunications services.

## FACTUAL ALLEGATIONS

8. In 2004, in a bid to remain competitive within the ever changing industry of telecommunications, Convergia sought to expand its network and services and to centralize its operations by consolidating all telecommunication equipment and services with one main provider. Convergia sought to include in its portfolio of services and network capabilities the following sample product offerings: voiceover IP ("VOIP"), voice conferencing, video phones, video conferencing, voicemail, call forwarding, call waiting, caller ID, local telephony services, and many others. These services were meant to enhance Convergia's existing product offerings and to allow the company to offer "next generation" services to its current customer base as well as, primarily, to capture new customers in seventeen (17) countries.

9. Following an exhaustive due diligence involving a number of potential service providers and following lengthy negotiations with Huawei, on September 7, 2004, Convergia entered into a governing agreement with Huawei. This governing agreement is entitled the NGN (or the "Next Generation Network") Data Network Purchase Agreement ("the Agreement"). The Agreement was also executed by Future Electronics Inc.

10. The Agreement is the direct result of protracted negotiations following the submission of a technical proposal to Convergia by Huawei in May of 2004 ("the Technical Proposal"). The Technical Proposal provided the specifications to be delivered

by Huawei and all representations made pursuant to the technical proposal survive and are incorporated into the Agreement pursuant to Section 4.1 of the Agreement.

11. The Agreement sets out the rights and obligations of each party to the Agreement.

12. Pursuant to the Agreement, Huawei was to provide Convergia with, among other things as set forth herein, an Internet Protocol telecommunications network along with related hardware, software, peripherals, and support relating to the NGN and Data Network. Specifically, Huawei was to provide a commercially ready end to end next generation network for the seventeen (17) countries in which Convergia possessed licenses.

13. Approximately two years have transpired since the signing of the Agreement, and Huawei has failed to comply with numerous key provisions of the Agreement, the most egregious of which will be detailed herein.

### First Claim for Relief
### Declaratory Judgment Mandating Arbitration

14. Convergia repeats and realleges each and every allegation of paragraphs 1 through 13 hereof as if fully set forth.

15. It has always been Convergia's intention to proceed to arbitration pursuant to Section 8.22 of the Agreement. Convergia has now exhausted all of its pre-arbitration steps, including the requirement to go to mediation, and hereby demands that the arbitration proceedings, pursuant to Section 5.2.4.4 and 8.22, commence in accordance with the terms of the Agreement.

16. In the Termination Letter, Huawei purports to terminate the Agreement "based on Convergia's material breach of Section 5.2.4.4 of the Agreement, among other breaches."

17. Section 5.2.4.4 of the NGN Data Agreement provides in full:

**5.2.4.4. Acceptance Testing**

After completion of Installation for each Site, Huawei/Futurewei will notify Convergia in writing hat Huawei/Futurewei has completed Installation and that the Systems is fully operational and ready for Acceptance Testing by Convergia. Convergia, with the cooperation and assistance of Huawei/Futurewei, shall conduct the Acceptance Test for the application within fifteen (15) Business Days of notice (the "Acceptance Test").

In cases that the defects of the System are not attributable to the default of the Huawei/Futurewei, the issuance of FAC (Final Acceptance Certificate) shall not be withheld for more than one hundred eighty (180) Days from the arrival of the System at its destination as designated under the respective Purchase Order.

If, the System has passed Final Acceptance Tests and the test documents have been signed by the engineers of Convergia and Huawei/Futurewei, Convergia shall issue the respective Acceptance Certificates to Huawei/Futurewei immediately after the end of each test period. If Convergia still withhold the issuance of such Acceptance Certificate ignoring the fact that the System has passed the respective Acceptance Tests, the System shall be automatically treated as having passed the Acceptance Tests and the Acceptance Certificates shall be issued by Huawei/Futurewei alone.

If Convergia arbitrarily rejects the issuance of the Acceptance Certificate ignoring the fact that the System complies with all technical standards or there are any disputes about the result of any Acceptance Test between the Parties, a third independent party such as AAA group American Arbitration Association shall be empowered to conduct the acceptance Test so as to decide whether the System meets the technical requirements or not. The cost and expenses of the third independent party of each arbitration shall be borne equally by Convergia and Huawei/Futurewei.

19. On August 7, 2006, Convergia sent a letter of response to Huawei in which it requested that Huawei withdraw its letter of termination and fully perform under the Agreement. On August 9, 2006, Mr. Ding sent a letter, via facsimile, to Mr. Bitar in which he clarified that the only breach that Huawei claimed under the NGN Data Agreement was Convergia's purported failure to submit to Acceptance Testing, as per Section 5.2.4.4 of the Agreement.

20. Huawei's attempt to terminate the Agreement for Convergia's supposed breach of Section 5.2.4.4 was improper for several reasons, including, but not limited to: one, Huawei cannot invoke Section 5.2.4.4 because "the Systems [are not] fully operational and ready for Acceptance Testing"; two, Huawei has failed to provide Convergia with the specific prior written notice to invoke Acceptance Testing of the subject systems; and three, even if the systems were ready to be tested, Huawei's sole remedy for refusal to test is to compel arbitration pursuant to Section 5.2.4.4, and not terminate the Agreement.

21. In addition, Huawei has further acknowledged that any arbitration to take place pursuant to Section 8.22 will address all issues arising out of the Agreement, including, but not limited to, Huawei's Section 5.2.4.4 claims against Convergia with respect to the Acceptance Testing.

22. Section 8.22 reads as follows:

> **8.22 Dispute Resolution**
>
> The following procedures shall apply to any dispute of disagreement between the Parties or any of their Related Parties (i.e., such Party's wholly owned subsidiaries, and the respective divisions, heirs, successors and assigns of such Party and its wholly owned subsidiaries) arising out of this AGREEMENT.

First: (i) either Party may give written notification of such dispute or disagreement to the other Party and

(ii) the Parties all communicate with each other promptly with a view to resolving such dispute or disagreement within twenty-one (21) days (or such extended period as the Parties agree is appropriate in any case) after such written notification is given.

The giving of any notice regarding any dispute or disagreement under this Section shall toll the running of all applicable statutes of limitation until the later of (i) ninety (90) days following the giving of such notice or (ii) thirty (30) days following the termination of discussions between the Parties concerning such dispute or disagreement.

Second, if at the end of the twenty-one (21) day period (as it may be extended) such dispute or disagreement has not been resolved to the satisfaction of both Parties, either Party may request in writing that such dispute or disagreement be the subject of non-binding mediation. Following such request, the Parties shall endeavour in good faith promptly to identify a single person (who shall be a person with experience and good reputation) who shall assist the Parties in discussing such dispute or disagreement and in attempting to reach a mutually acceptable business resolution. Such mediation process shall terminate not later than thirty (30) days following the request thereof (of such extended or shorter period as the Parties agree is appropriate). All applicable statutes of limitation shall be tolled during the period of mediation.

Third, if at the end of the thirty (30) day period (as it may be extended or shortened) such dispute or disagreement has note been resolved to the satisfaction of both Parties, either Party (the "complainant") may commence binding arbitration by giving the other Party (the "respondent") notice in writing (the "initiating notice") setting forth in reasonable detail the nature of its claim and the relief requested stating that the complainant is invoking the procedures set forth in this Section and naming the complainant's representative on the Arbitration Panel (as defined below). Within twenty-one (21) days of receipt of an initiating notice, the respondent shall give the complainant notice in writing (the "response") setting forth in reasonable detail: (i) the basis of its response to the claim; (ii) the nature of any counterclaim it has against the complainant arising from

the same set of facts and circumstances that gave rise to the original claim; (iii) any other counterclaim that Party wishes to bring at that time (although the Party has no obligation to bring such counterclaims at that time); (iv) the relief requested; and (v) naming the respondent's representative on the Arbitration Panel. The two representatives shall select a third person who is mutually acceptable to them. If the representatives fail to make such selection within twenty-one (21) days, the complainant and the respondent shall each replace its representative with a new representative and the new representatives shall be subject to the preceding sentence and this sentence. Once a third person is selected, such person together with the representatives of the complainant and the respondent shall form the Arbitration Panel. The date upon which the Arbitration Panel is formed shall be the "Commencement Date."

The Arbitration Panel shall conduct proceedings to determine the merits under applicable law of the claims set forth in the initiating notice and the response. The proceedings shall be administered by the ICC arbitration rules then in force, subject to the following additional rules:

(i) the proceedings shall take place in New York City, State of New York;

(ii) the Arbitration Panel (including, if necessary, any replacement(s) to the Arbitration Panel) shall be selected as set forth in above;

(iii) the available relief shall include damages, injunctive relief and equitable relief to the extent allowed under the applicable law, this AGREEMENT and any other AGREEMENT between the Parties;

(iv) the Parties shall attempt in good faith promptly to agree on the nature and extent of any discovery in connection with arbitration, provided that, in the absence of such AGREEMENT, discovery shall be governed by ICC Arbitration Rules and Procedures. In addition, the applicable law with respect to privilege and other protections from disclosure, including the work product doctrine shall apply;

(v) the final decision of the Arbitration Panel (THE "Award") shall be issued within six months of the Commencement Date (the date of issuance of the Award being

the "Award Date") and must be joined by at least two members of the Arbitration Panel;

    (vi) each Party to the proceedings shall pay its own costs in connection with proceedings, including the cost and expenses of its representative on the Arbitration Panel, and the Parties shall share equally the other costs of the proceedings, including the fees of the third member of the Arbitration Panel, except that the prevailing Party shall be entitled to recover its attorneys' fees incurred in prosecution thereof.

The Award shall be final and binding and judgment thereon may be entered by any state of federal court having jurisdiction thereof.

Nothing in this Section shall be construed to preclude either Party from seeking injunctive relief in a court of competent jurisdiction to prevent imminent irreparable harm. The dispute resolution procedures set forth herein shall be stayed pending disposition of any application for such relief. The Parties agree that a court of competent jurisdiction may consider the merits of any claim that is subject to the dispute resolution procedures set forth herein to the extent necessary to resolve any permissible application for injunctive relief.

23. As noted, *supra* paragraph 3, Convergia will suffer irreparable harm if the injunctive relief sought here is not granted.

24. Accordingly, it is entirely appropriate for this Court to enter an order compelling a single arbitration proceeding addressing all claims between the parties.

### Second Claim for Relief
### Breach of Contract

25. Convergia repeats and realleges each and every allegation of paragraphs 1 through 24 hereof as it fully set forth.

26. There is no dispute regarding the existence of a contract. Convergia has steadfastly continued to perform under the Agreement, in spite of Huawei's refusal to meet its clearly stated obligations.

27. Huawei has committed a series of material breaches wholly separate from the Section 5.2.4.4 breach outlined above.

28. Convergia has repeatedly notified Huawei of its failures to perform pursuant to the Agreement.

29. In fact, as early as January 24, 2006, by way of correspondence, Convergia provided Huawei with a non-exhaustive list of substantive contractual breaches committed by Huawei (the "Notice Letter").

30. With respect to Sections 5.2.1 – Homologation and 6.5.2 – Dedicated Support Team, among other sections of the Agreement, Huawei either greatly delayed or failed to provide:

- a dedicated support team in Buenos Aires, Argentina;
- a solution to the government mandated prompt in Peru ("Convergia 1960");
- a Radius interface for Convergia to launch its VOIP and CIC products;
- the intelligent routing feature requested by Convergia;
- a payphone identifier solution as per local exchange carriers' mandated configurations;
- a CIC identifier solution as per local exchange carriers' mandated configurations;
- faxes over Huawei UMG that work properly;
- a remedy for packet loss and latency over Huawei's NE40 routers;
- a solution to regulate output power level in UMG of Toronto;
- a network monitoring system ("NMS");
- a commercially functional IN (or "intelligent network") for launch and support of prepaid services;
- homologated equipment in certain countries;
- an online troubleshooting mechanism for multiple calls on an SS7 link and/or a PRI;
- CDR (call detail record) documentation and completeness with respect to CDR output; and
- equipment to meet Convergia's large corporate and call-shop market as per Convergia's request and Huawei's representations (V8020/AR2880).

31. In addition, and as a result of Huawei's failure to perform under to the Purchase Agreement, Convergia has been forced to contend with the following:

- cut calls – lack of support of G729 CODEC;
- cut calls – lack of compatibility with Progress Message;
- blocked calls – lazy port at ISDN level;
- cut calls originating from IADs (Internet Access Devices) - lack of support of G729 family of Codecs;
- CSC (call source code) – lack of differentiation between national and international calls as per governmental rules;
- ANI manipulation – inability to identify where calls emanate from, as per governmental rules;
- an attempt by Huawei to cap the IN licenses at 50,000 pins;
- an attempt by Huawei to nullify a valid Convergia PO and charge a higher value for the voicemail system;
- an attempt by Huawei to charge shipping supervision fees for mini UMGs;
- lack of support of Off-Band DTMF to be able to recognize dial tones via Internet Protocol.

32. In almost all of the aforementioned cases, Convergia first requested that Huawei fulfill these obligations over one year ago. These failures and delays by Huawei relate to basic communications features and functions. They do not even address the next-generation communications functionality that Huawei promised to deliver to Convergia, pursuant to the Agreement, together with the aforementioned basic communications features and functions.

33. As is provided for in Sections 5.2.1 and 6.5.2 of the Agreement, Huawei is obligated to provide equipment that complies with "local governmental rules in all countries where Convergia has operations (Section 5.2.1), meet "Local Exchange Carriers mandated configurations (Section 6.5.2)" and resolve "complex and uncommon problems (Section 6.5.2)" as well as "Convergia specific problems, (Section 6.5.2.)" and it is further obligated to provide all resources "including using Huawei's and Futurewei's Shenzhen Head Office technical resources, to ensure that System is commercially ready

in each country of Convergia's operation. (Section 6.5.2)". Huawei has failed to perform as promised.

34. As to Section 4.7 of the Agreement, Huawei discontinued the Eudemon model 2100 without providing "at least twelve (12) months prior notice of discontinuance" as is required by the Agreement.

35. As to Section 6.7 of the Agreement, Huawei has failed to maintain an inventory of finished parts in Plano, Texas, United States so as to be able to react immediately to equipment failures and/or shipment errors. Huawei has already shipped equipment with the following failures: (a) Router card failure in Mexico; (b) Router board failure in NAP of the Americas; (c) Router card forced replacement in NAP of the Americas; (d) Router card forced replacement in 60 Hudson, NYC; (e) Router card forced replacement in Buenos Aires, Argentina; (f) Router card failure in Lima, Peru; (g) Defective UMG card in Madrid, Spain, (h) Defective Softswitch card; (i) E1 cards to UMG in Vancouver, Canada B.C. as opposed to the ordered and mandated T1 cards; and (j) incorrect mounting brackets for mini-UMG.

36. Additionally, Huawei has not had adequate inventory in Plano, Texas for any of the foregoing cases and it has taken an extremely long time to ship replacement equipment from Shenzhen, China.

37. As to Section 2.2 of the Agreement, Huawei has failed to treat Convergia as "Most Favored Customer" in terms of pricing. The Most Favored Customer provision states as follows: "Huawei/Futurewei represents that all of the prices, terms, warranties and benefits granted by Huawei/Futurewei hereunder are at least equivalent to the pricing terms being offered by it to any customer of Huawei/Futurewei or Huawei." Huawei has

confirmed that Convergia is not receiving most favored customer terms with respect to pricing.

38. In addition to the foregoing breaches, Huawei has breached and/or failed to provide technical and service requirements under the Agreement, including but not limited to:

- TCIC wasted: problems with Huawei's T1 functionalities, that in essence block 2 ports in for every T1. This signifies an 8% restriction in capacity;
- Codec Negotiation: With respect to H.323, during the call setup, when Setup message with CODEC g729B and G723is sent to the Soft-X, it responds alerting with G723, despite the preference set on the trunk group as G.729B. Essentially, the Soft-X does not negotiate the CODEC but imposes G.723;
- Voicemail system down. Convergia has not received any reason for this failure . Convergia is unable to begin offering this required service to our customers;
- IN system hardware failures. This IN platform suffers due to various hardware issues;
- UMG not recognizing answer tone when the call is answered within a second. Huawei was notified of this major problem in the UMGs;
- Offline Soft X monitoring tool fails when opening PRA files;
- Load Balancing program not working as it should, thus creating the feature unable of entering into production as it would imply contradicting the standard LCR routing in the industry;
- Convergia has been notified that Huan Xiang ("Elly"), a Huawei dedicated support team member, will be leaving from Montreal the week of August 11, 2006. Convergia has urged Huawei to prolong her stay, to ensure the Radius implementation, Voicemail operation, Class 5 functionalities and other major R&D requirements in order to ensure that basic functionalities with respect to the network are accounted for. In addition, Biao Feng, another dedicated support team member has left Montreal for China and does not support Convergia in a dedicated manner. Essentially, Huawei is in the process of dismantling the dedicated support team that it is obligated to provide pursuant to the Agreement;

- XML interface with Telarix: Huawei has delayed this interface, despite the fact that it purported to support such interface in Page 11 of the technical proposal.

- Not installing second T1 card in Vancouver switch, after being required to replace said card due to Huawei's error of sending E1 cards to North America. Huawei only sent 1 card replacement, instead of 2 cards, and Huawei has yet to install the second card;

- SNMP functionality. This is a key functionality that will allow Convergia to interface to monitoring systems, such as Cricket. On page 57 of the technical proposal, Huawei purported to support this functionality and such has not been the case;

- IADs do not support H323. Pursuant to page 84 of the technical proposal, Huawei purported that their IADs supported H323 yet this is not the case. This lack of protocol support limits Convergia's usage of the IADs with other network components and has significantly delayed Convergia's VOIP launch (which is due to Huawei not supporting Radius and having to develop this solution which is still under testing).

- Soft X 3000 Class 5 functionalities are not supported under SIP protocol. On page 41 of the technical proposal, Huawei purported to support all such functionalities, not limiting them to only MGCP (which is the only standard they currently support);

- Fake Ring Back. Some calls originated over the UMG ring even before they get connected, creating a bad perception from the customers' standpoint as they hear ring back immediately followed by Busy Tone or Fast Busy. Soft-X plays Ring Back prior to the progression of the call and when the call does not connect, it plays the real message that it gets from the far end. This is extremely annoying for Convergia's customers, to say the least, who do not know how to understand the signals they receive and believe that their calls were dropped.

- NMS cannot be used for Class IV provisioning (as per Huawei's NMS Operation Manual). Some of the menus in the NMS tool do not work thereby making it impossible to use this tool in order to provision trunks. As an example, the CNA LD table button, when clicked, displays no information, but if one is to click on the RSM table button, the information for CAN LD is displayed. Additionally, none of the tables have ADD, DELETE or MODIFY buttons, all of which were present in the previous version, making impossible to modify the content of the programming.

- IN Rate Plan loading. Convergia has been informed by Jian Wu that loading a new product's rate plan in the IN platform, takes two

weeks in duration, even for the most expert or senior of Huawei's engineers. We are deeply concerned with respect as to how complicated this platform has become, and we are further concerned by the notion that we may not be able to launch new products as a result that would otherwise normally require a one day turn around. The platform should not be this complicated.

39. Finally, Huawei breached the Agreement by sending a notice of termination of the Agreement on July 25, 2006, effective August 25, 2006. Huawei's attempt to terminate the Agreement for Convergia's supposed breach of Section 5.2.4.4 was improper because Huawei did not comply with the terms of Section 5.2.4.4, which requires arbitration of all "Acceptance Testing" issues.

40. As a result of Huawei's numerous breaches, Convergia has suffered significant damages and difficulties operating a viable telecommunications network, including, but not limited to, its launch of "commercially ready" products and services, thus generating huge lost opportunity costs, unutilized fixed investments, loss of business, damage to reputation, goodwill and brand name as well as jeopardizing the necessary licenses that Convergia has secured in a host of countries along with jeopardizing the use of the essential services provided to Convergia's wholesale, business and residential customer base.

41. Huawei's breaches have caused Convergia significant damages in an amount to established at arbitration.

### Third Claim for Relief:
### Fraudulent Inducement of Contract

42. Convergia repeats and realleges each and every allegations of paragraphs 1 through 41 as if fully set forth.

43. Huawei made a series of promises regarding its ability to provide services and other contractual commitments that it clearly had neither the intention nor the ability to keep. To wit and amongst other breaches, Huawei has: failed to maintain proper inventory of replacement parts; failed to meet the specifications as set forth in the Technical Proposal provided to Convergia by Huawei in May of 2004; failed to properly comply with local government regulations; failed to send the promised dedicated support team to Argentina; failed to provide equipment to meet Convergia's large corporate and call-shop market, and has failed to treat Convergia as "Most Favored Customer" in terms of pricing. These assurances, as well as many others that have not been met, convinced Convergia to enter into the Agreement.

44. It is axiomatic that Convergia would have never entered into the Agreement with the knowledge that Huawei would be unable to provide even the basic services and contractual commitments as set out in the Agreement. There is also no doubt that Huawei *never intended to perform*, as its course of conduct has shown these types of services, among other "enhanced services," are well beyond its expertise. Clearly Huawei fraudulently induced Convergia into signing the Agreement, all the while knowing that it would never be able to and/or knowing that it had no intention to perform as promised to Convergia.

45. It is clear that Huawei never intended to perform under the Agreement, especially with regard to the provision of so-called enhanced services. The numerous and continuing material breaches of the contract, coupled with Huawei's ill-fated and premature attempt to terminate the contract, belie any suggestion that they had either the

ability or intent to perform when it made its promises to Convergia to provide both basic telephony services and "next generation" products and services.

47. Convergia would never have considered entering into the Agreement without explicit assurances from Huawei that it could perform, expressed during negotiations and in the Agreement itself.

47. Huawei's July 25, 2006 notice of termination of the Agreement effective August 25, 2006, and its blatant disregard for Sections 5.2.2.4 and 8.22 of the Agreement, proves that Huawei never intended to bind itself to the contract it signed with Convergia. As a result, Convergia was fraudulently induced into signing the Agreement.

48. As a result of the fraud, Convergia has literally been placed at the brink of bankruptcy. Huawei's actions, or lack thereof, have resulted in damages in an amount to be established at arbitration. Perhaps more importantly, they have imperiled Convergia's ability to retain licensing in numerous countries. Many of Convergia's telecommunications licenses, amounting to approximately fifty (50) specific licenses, including but not limited to, local telephony licenses, national long distance licenses, international long distance licenses and value added licenses encompassing data, multi-media and video amongst other services, will either be revoked by local governments and regulatory agencies and/or will expire, thereby depriving Convergia of the ability to ever offer telecommunications services in all of the countries governed by the Agreement. Without said licenses, Convergia will no longer exist as a functioning corporate entity.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

(a) Enter an order preliminarily enjoining Huawei from terminating the agreement with Convergia; and

(b) Enter an order compelling the parties to arbitrate all of their disputes in a single binding arbitration; and

(c) Award Convergia such other and further relief that it that Court deems just and proper.

Dated: New York, New York
      August 15, 2006

                                  MAYER, BROWN, ROWE & MAW LLP

                                  By: _____
                                       A. John P. Mancini (AM-5829)
                                       Ryan P. Farley (RF-6984)
                                       Bradford Jealous III (BJ-2530)

                                         1675 Broadway
                                         New York, New York 10019
                                         (212) 506-2500